**Pages 1 - 9**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

JILL BROWN and AUSTIN RUSSELL, individually and on behalf of themselves and all others similarly situated, )
)
Plaintiffs, )
)
VS. )   **No. C 19-0371 JD**
)
SHARP ELECTRONICS CORPORATION, )
)
Defendant. )
) San Francisco, California
Thursday, August 1, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:   WHITFIELD BRYSON AND MASON LLP
900 W. Morgan Street
Raleigh, North Carolina 27603
**BY: HARPER T. SEGUI, ESQ.**

For Defendant:   RIKER DANZIG
1 Speedwell Avenue
Morristown, New Jersey 07962
**BY: BRIAN E O'DONNELL, ESQ.**

DONAHUE DAVIES LLP
P.O. Box 277010
Sacramento, California 95827-7010
**BY: KAYLA VILLA, ESQ.**

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
Official Reporter - U.S. District Court

```
 1   Thursday, August 1, 2019                            10:09 a.m.
 2                        P R O C E E D I N G S
 3                              ---o0o---
 4         THE CLERK:  Calling Civil 19-371, Brown versus Sharp
 5   Electronics.  Counsel.
 6         MS. SEGUI:  Good morning, Your Honor.  Harper Segui
 7   for the plaintiffs.
 8         MR. O'DONNELL:  Good morning, Your Honor --
 9         THE COURT:  Could you say your last name again.
10         MS. SEGUI:  Segui.
11         THE COURT:  Segui, thank you.
12         MR. O'DONNELL:  Good morning, Your Honor.  Brian
13   O'Donnell, from Riker Danzig, on behalf of defendant.  With me
14   is co-counsel.
15         MS. VILLA:  Kayla Villa with the firm of Donahue
16   Davies.
17         THE COURT:  All right.  Well, it's an interesting
18   plan.  Thank you for putting it together.  Looks like you
19   worked out a good arrangement.
20      What happened to the Northern District of New York case?
21         MS. SEGUI:  So we actually -- we dismissed that.
22   There was an issue related to diversity.  So that one has been
23   voluntarily dismissed.  We have filed an action in Ohio last
24   week.
25         THE COURT:  Ohio?
```

 1              **MS. SEGUI:**  Yes.
 2              **THE COURT:**  Okay.
 3              **MS. SEGUI:**  We obviously have outlined what we are
 4     going to do with that case and any future filed cases.
 5              **THE COURT:**  So it's here, Georgia, and Ohio.
 6              **MS. SEGUI:**  Yes.
 7              **THE COURT:**  And I'm the lowest digit case-filing
 8     number?
 9              **MS. SEGUI:**  You are number one.
10              **THE COURT:**  Have you talked with the judge in Georgia
11     about the plan?
12              **MS. SEGUI:**  No, Your Honor.
13              **THE COURT:**  The coordinated plan.
14              **MS. SEGUI:**  Not quite yet.
15         The judge did just issue, a couple of weeks ago, an order
16     directing us to submit a scheduling order.
17         We filed a motion to stay, just a short stay, to try to
18     get this coordination plan in place before we passed --
19              **THE COURT:**  Was that a joint motion?
20              **MR. O'DONNELL:**  Yes, Your Honor.
21              **THE COURT:**  Great.  And just remind me who your judge
22     is in Georgia.
23              **MS. SEGUI:**  That is Judge Ashley Royal.
24              **THE COURT:**  All right.  Well, here's what I would like
25     to do.  You had a little bit of disagreement on some of the

1    details, in the number of interrogatories and things.

2    Mr. O'Donnell, I think you said something, that there's a
3    middle district of Georgia rule you were following.

4    **MR. O'DONNELL:** Well, Your Honor, there are basically
5    three areas of disagreement that I think we have.  I think we
6    worked very well together to agree on a number of issues.

7    **THE COURT:** It looked like it.  I'm grateful for that.
8    You cited a Middle District of Georgia Local Rule for the
9    number of RFPs, interrogatories, and RFAs.

10   **MR. O'DONNELL:** And what we're trying to do is impose
11   reasonable restrictions on written discovery requests to be
12   consistent with the polestars Your Honor mentioned the last
13   time, of efficiency and conservation of judicial resources.

14   I always find that setting targets forces parties to try
15   and work efficiently towards those targets.  And, of course,
16   there is built into our protocol the ability to either agree
17   amongst ourselves that additional requests may be necessary or
18   to come back to the Court for good cause.

19   We did cite to the Georgia statute, which is much more
20   limited in terms of what it permits.  I believe Ohio has
21   certain limitations as well.  And I know plaintiff has
22   indicated that they plan on filing in other states that may or
23   may not have --

24   **THE COURT:** On that, so when is this going to become a
25   MDL possibility?  You're at three districts now.  Usually the

1  tipping point is several more.  Are you planning a lot more?
2       **MS. SEGUI:**  Yes, Your Honor.  We have statutes of
3  limitations issues we have to take into consideration.  We
4  didn't plan on an MDL just because all the attorneys will be
5  the same.  We would be interested in, potentially, a 1404
6  transfer.
7       **THE COURT:**  All the judges are different.  The MDL is
8  really serving that interest as well as -- it's really serving
9  mainly federal judicial efficiency, as well as the parties.
10      It's just an idea.  But if you're going to have a slew
11 more, like another half dozen or more, it's going to be up to
12 the defendant, I would imagine.  Although, plaintiffs can ask
13 too.  There's no bar on who gets to ask.
14      But at some point there's going to be an MDL issue, maybe,
15 depending on what you do.  But right now the plan is I'm going
16 to handle all the discovery.  Is that --
17      **MR. O'DONNELL:**  Your Honor, that's what we were hoping
18 for.  Again, depending upon how many new cases get --
19      **THE COURT:**  I'm fine with that.
20      **MR. O'DONNELL:**  Yes.
21      **THE COURT:**  That makes perfect sense to me.  And, you
22 know, I'm kind of inclined to just -- I think the Georgia
23 numbers are a little too tight.  So why don't we just go with
24 the plaintiffs' numbers.  And you all seem to be okay on
25 everything else.

1           What were the other two areas?
2               **MR. O'DONNELL:**  There are two other issues, Your
3  Honor.  One deals with the identification of plaintiffs.  And,
4  again, this becomes important as we're talking about other
5  states in which litigation may be brought.
6          It is the defendant's position that plaintiffs should have
7  to identify their clients as part of our initial disclosures.
8  The reason for that is we want to be very careful to preserve
9  any evidence that belongs to an actual plaintiff in this
10 litigation.
11         So I know that we're going to try and have discussions to
12 work that out, but Sharp does not want to be running in a
13 spoliation trap.  And if we can --
14              **THE COURT:**  How are they supposed to identify nonnamed
15 class members?
16              **MR. O'DONNELL:**  Well, my understanding, and Counsel
17 can correct me if I'm wrong, my understanding is that they're
18 bringing additional lawsuits with named representatives in
19 other jurisdictions.
20              **THE COURT:**  Well, they have to.  They can't --
21              **MR. O'DONNELL:**  I'm sorry?
22              **THE COURT:**  They have to have a named plaintiff.
23              **MR. O'DONNELL:**  I know they have to.  And I imagine if
24 they're planning on doing it, they know those plaintiffs.
25              **THE COURT:**  You're saying you want to know in advance,

1  just the named plaintiffs?
2      **MR. O'DONNELL:** I don't want to run into a situation
3  where we get a microwave back for whatever reason -- you know,
4  a dent, a scratch, the handle falls off -- and we recycle it,
5  and later on we find out that this individual is now a client
6  of plaintiffs'.
7      **THE COURT:** So your client would typically destroy
8  the --
9      **MR. O'DONNELL:** They get recycled. They get recycled
10 as part of, you know, our warranty process.
11     **THE COURT:** All right. Well --
12     **MS. SEGUI:** Your Honor, and our typical practice is we
13 would send a preservation letter in advance of filing a
14 lawsuit. You know, for example, we -- we don't necessarily
15 intend to file a lawsuit on behalf of every single one of our
16 clients. We have a client in the Southern District of
17 California right now, and we don't intend to add her to this
18 lawsuit. And she's a putative class member under this lawsuit
19 also.
20     So, you know, I think that our clients are protected by
21 attorney-client privilege, the identity of them as well. We
22 typically send these preservation letters out anyway. So I
23 think that them finding out the identity either via the
24 preservation letter or the complaint should be sufficient.
25     **THE COURT:** Okay. Well, I mean that is usual

1  practice.  Seems to me you might want to consider -- you can
2  just send a list to your colleague and say these people may --
3  it's not binding.  You don't have to sue on their behalf.  But
4  in the interest of getting things preserved early, just say,
5  the following 12 people may be plaintiffs, and leave it at
6  that.  You're not under any obligation.  You don't have to sue
7  on any of those people.  Send a letter two weeks later or six
8  months later saying you decided not to do it.
9            **MR. O'DONNELL:**  And we're not trying to bind them to
10 actually pursue those litigations.
11           **THE COURT:**  They wouldn't be bound.
12           **MR. O'DONNELL:**  We want to make sure we're following
13 our obligations.
14           **THE COURT:**  She's not making a contract to sue.  Think
15 it over.  I don't see any harm in that, but it's up to you two.
16 Keep talking.
17      Initial disclosures on the 6th.  And here's what I would
18 like you to do.  Send me a proposed order, all right, and put
19 it -- send me a Word version to my mailbox, which I believe is
20 JDPO -- what is it?
21           **THE CLERK:**  @cand.uscourts.gov.
22           **THE COURT:**  Okay. Yes, JDPO and the usual address.
23 Just a Word version that I can use.
24           **MR. O'DONNELL:**  Your Honor, if I could have your
25 indulgence.

1      **THE COURT:**  Yes.
2      **MR. O'DONNELL:**  There's one last issue where we
3  disagree about, and that's a bifurcation issue.  Plaintiffs'
4  proposal seems --
5      **THE COURT:**  Oh, yes.  I don't bifurcate.  Everything
6  done at once.
7      **MR. O'DONNELL:**  You had said that before, and I just
8  wanted to make sure.
9      **THE COURT:**  No bifurcation.
10     **MR. O'DONNELL:**  Okay.  Thank you.
11     **THE COURT:**  All right.  So now you understand that I
12 am not tying the hands of any of my brothers and sisters in
13 other districts.  So they are perfectly free to do whatever
14 they want.  So I don't know what the judges will do in Ohio and
15 Georgia.  And they may say, no, I'm not going to rule that way,
16 and you're going to have to do something in response.
17     But the core is good.  You're going to have a central
18 repository of documents, you're going to depose everyone once;
19 one and done for all the witness.  Try to have master sets of
20 things.  That's great.  Okay?
21     All right.  Thanks a lot.  Appreciate your work on that.
22     **MR. O'DONNELL:**  Thank you, Your Honor.
23     **MS. SEGUI:**  Thank you, Your Honor.
24     (At 10:19 a.m. the proceedings were adjourned.)
25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, August 15, 2019

*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter